945 So.2d 665 (2006)
DENHAM SPRINGS ECONOMIC DEVELOPMENT DISTRICT
v.
ALL TAXPAYERS, PROPERTY OWNERS AND CITIZENS OF the DENHAM SPRINGS ECONOMIC DEVELOPMENT DISTRICT, and nonresidents owning Property or Subject to Taxation therein, and all other Persons Interested in or Affected in any way by the Issuance of not to exceed $50,000,000 Denham Springs Economic Development District Sales Tax Increment Bonds (Bass Pro Shops Project) in one or more series, the means provided for the payment and security thereof and related matters.
No. 2005-C-2274.
Supreme Court of Louisiana.
October 17, 2006.
Rehearing Denied December 15, 2006.
*667 Liskow & Lewis, PLC, Cheryl M. Kornick, Robert S. Angelico, Kenneth T. Wallace, Kelly B. Becker, New Orleans, Counsel for Applicant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, William L. Schuette, Jr., Fred L. Chevalier, Baton Rouge, Harry S. Hardin, III, New Orleans, James C. Percy, Michael C. Herbert, David M. Kerth, Baton Rouge; Rainer, Anding & McLindon, Robert R. Rainer, Baton Rouge, Harris and Pugh, Jay Jones Harris, Counsel for Respondent.
*668 KNOLL, Justice.
This writ concerns a political subdivision's economic project financed by revenue bonds secured by tax increment financing.[1] The case is in a procedural posture and does not concern the merits of the project itself. The issues raise objections to notice by publication and peremption.
More specifically, we are called upon to address the legal questions of whether the peremptive period set forth in La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L precludes any challenges to the provisions of a bond resolution, including the provisions made for the security and payment of the bonds; and, whether notice solely by publication of a bond resolution violates the procedural due process rights of known, interested persons.
Plaintiffs, the Denham Springs Economic Development District (the "District") filed a motion for judgment seeking judicial validation of the District's revenue bonds and the means of securing and paying the bonds, as described in the District's published bond resolution (the "Bond Resolution"). The District subsequently filed a motion to strike all challenges to the bonds at issue and for entry of final judgment, alleging the thirty-day time limit provided in La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L for a challenge to the validity of a bond resolution and related proceedings, was a peremptive period that had already run before the individual defendants, A. Ponder Jones and Beverly Bonneval,[2] filed their answer to the District's motion for judgment. The district court granted the motion to strike the challenges, holding the individual defendants' right to challenge the Bond Resolution was perempted. Finding no violation of due process and the individual defendants' right to challenge perempted, the court of appeal affirmed the judgment, except as to the court's holding that a challenge to the legality of the election was perempted. We granted writ primarily to address the issue of peremption as well as notice. Denham Springs Economic Development District v. All Taxpayers, Property Owners, and Citizens of the Denham Springs Economic Development District et al., 05-2274 (La.4/17/06), 945 So.2d 689. [Denham *669 Springs II].[3] For the following reasons, we now affirm the court of appeal, finding the individual defendants failed to challenge the Bond Resolution within the time limit allowed by the constitution and statutory law and finding no procedural due process violation as the publication of the Bond Resolution satisfied the notification procedure mandated by our constitution and statutory law.

FACTS AND PROCEDURAL HISTORY
In 2003, the District was created as a political subdivision of the State pursuant to La.Rev.Stat. 33:9038.2 to facilitate economic growth in an area comprised of seventy-five acres of vacant land within the City of Denham Springs, Louisiana. The Bass Pro Project (the "Project") contemplates the creation of a twenty-seven acre retail outlet, including a restaurant, related infrastructures and public improvements, and a Bass Pro Shops retail store within the District. The Project is to be funded through the issuance of revenue bonds by the District secured by the pledge of local government sales tax increments, in accordance with La.Rev.Stat. 33:9038.4A.
On March 8, 2005, the District adopted a bond resolution, which the District published on March 13, 2005, in the Livingston Parish News, the official journal of the District in Denham Springs, Louisiana, as required by La.Rev.Stat. 33:9038.4L, proposing to issue revenue bonds in the amount of $50,000,000 for a term not to exceed thirty years. The Bond Resolution declared the District desired to authorize the issuance of the bonds[4] to provide financing for (I) the acquisition of approximately twenty-seven acres of land within the District; (ii) the acquisition, development, construction, and equipping of a Bass Pro retail outlet and related infrastructure to be operated by Bass Pro Outdoor World, L.L.C. or a related entity; (iii) the construction of related public improvements and infrastructure needed to support the facility and the remainder of the District; (iv) funding a deposit to the Debt Service Reserve Fund; (v) paying capitalized interest on the Series 2005A and Series 2005B bonds; and (vi) paying cost of issuance of the Series 2005A and Series 2005B bonds.
According to the Bond Resolution, the District desired to enter into a Cooperative Endeavor Agreement with the City of Denham Springs ("City"), the Parish of Livingston ("Parish"), the Gravity Drainage District No. 1 of the Parish of Livingston ("Gravity Drainage District"), the Law Enforcement District of the Parish of Livingston ("Law Enforcement District"), the Livingston Parish School Board ("School Board"), the Special Sales Tax *670 District No. 1 of the Parish of Livingston ("School District"),[5] the Denham Springs Economic Development Corporation[6] and the State of Louisiana, through the Department of Revenue and Taxation. The District planned to enter into a Cooperative Endeavor Agreement with the Participating Tax Recipient Entities, the Corporation and the State to effect the collection and pledge of the sales tax increments to secure the payment of debt service on the bonds. The Joint Legislative Committee on the Budget, by a resolution adopted on March 19, 2004, authorized the District to use two cents of the four cents sales tax increment collected within the District by the Department of Revenue and Taxation for the State to secure the bonds.[7] This amount cannot exceed $1,500,000 for any bond year.
The published Bond Resolution included the names of the Participating Tax Recipient Entities and stated these entities had authorized special elections to re-dedicate and use for a limited time the proceeds of the sales tax increment collected within the boundaries of the District for the payment of debt service on the bonds issued to finance the Project.[8] The parties do not dispute these elections were held on April 23, 2005, and the voters overwhelmingly approved the re-dedication of the sales tax increment by the Participating Tax Recipient Entities.
The Bond Resolution further provided for the execution and delivery of a certain mortgage agreement on the Bass Pro site and facility and certain related improvements, in order to provide additional security for the bonds and the developer's obligations, providing fair market value be received for the Bass Pro site and facility prior to any title transfer thereof to private ownership, "which will be more particularly described within the above-referenced Mortgage Agreement, Cooperative Endeavor Agreement and related agreements necessary to effect the purposes thereof. . . ."
Section 9 of the Bond Resolution authorized the filing of a bond validation suit to establish and confirm the validity of the bonds and the security therefor, the validity of the Cooperative Endeavor Agreement, and the participation therein by the State and Participating Tax Recipient Entities. Section 11 provided:
This resolution shall be published in The Livingston Parish News, the official journal of the District published in Denham *671 Springs, Louisiana, and, as provided by the Act, for a period of thirty (30) days from the date of such publication thereof, any person in interest may contest the legality of this resolution, the Bonds to be issued pursuant hereto and the provisions securing the Bonds. After the said thirty days, no person shall have any right of action to contest the regularity, formality, legality or effectiveness of the resolution, any provisions of the Bonds issued pursuant hereto, the provisions for the security and payment of the Bonds and the validity of all other provisions and proceedings relating to their authorization and issuance for any cause whatever. Thereafter, it shall be conclusively presumed that the Bonds, the legal documents providing for the Bonds and all security for the Bonds are legal and that every legal requirement for the issuance of the Bonds has been complied with. No court shall thereafter have authority to inquire into such matters after the aforementioned publication period.
In its Notice of Intention to Issue Bonds immediately preceding the Bond Resolution in the March 13, 2005 publication, the District stated: "The Board will meet in open and public session and hold a public hearing at the City Hall Courtroom, Denham Springs, Louisiana on March 28, 2005 at 5:45 p.m. to hear any objections to the issuance of the Bonds."[9]
Well after thirty days of the publication, specifically on May 26, 2005, the District filed a motion for judgment, seeking judicial validation of the bonds and the means of securing and paying them as described in the Bond Resolution. The District filed this motion in accordance with La.Rev. Stat. 13:5123. After the filing, the district court ordered the publication of the motion for judgment and the accompanying court order as required by La.Rev.Stat. 13:5124. A hearing was scheduled for June 17, 2005.
On June 1, 2005, the individual defendants, A. Ponder Jones and Beverly Bonneval, filed an answer and a peremptory exception raising the exception of no cause of action.[10] On June 10, 2005, the district court ordered the second publication of the motion for judgment and the order. Another hearing was scheduled for June 28, 2005.
On June 17, 2005, the individual defendants requested a continuance to allow time for a deposition of a non-party to the suit, Bass Pro, and filed a separate motion for an expedited hearing on the motion for a continuance. The district court ordered the motion be heard by telephone conference on June 22, 2005, and after the hearing, *672 the district court denied the motion to continue.
On June 24, 2005, the District filed a "Motion to Strike All Challenges to Bonds and For Entry of Final Judgment."[11] The motion to strike essentially argued the thirty-day time limit, provided in La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L for a challenge to the validity of bond resolutions and related proceedings, was a peremptive period that had run before the individual defendants had filed their answer and, thus, the individual defendants' right to challenge was extinguished. The District contended that, pursuant to La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L, the thirty-day peremptive period had commenced with the publication of the Bond Resolution in the official journal of the District on March 13, 2005. Based on the alleged loss of the right to challenge, the District asserted the court must enter a final judgment recognizing the validity of the Bond Resolution and of all proceedings relating to the bonds, their issuance, security, payment, and authorization. The motion to strike was heard on June 28, 2005.
At the June 28, 2005 hearing, the individual defendants initially objected to hearing the motion to strike and for final entry of judgment, based on lack of formal service of the motion and notice of a requisite show cause hearing. In response, the District noted the trial was noticed for that day and argued the motion based on untimeliness could "be made orally at trial," and, therefore, did not require any additional notice. Finding the motion could dispose of the case, the district court decided it would hear the motion to strike.
On the issue of peremption, the individual defendants acknowledged they were not challenging the District's right to pledge its own money to the Project or to issue bonds secured by the District's money. Rather, their challenge was to the ability of other taxing entities to agree to cooperate in the Project and pledge their tax monies to secure the bonds. Further, the individual defendants asserted the time limit for challenging the Bond Resolution was not applicable to a tax election that had not been held, or to a cooperative endeavor agreement that was not yet finalized, at the time the thirty-day time limit had run. They also argued the thirty-day time limitation on challenges to bond resolutions did not apply to their challenge, which was based on the constitutionality of Chapter 27 of Title 33 of the Louisiana Revised Statutes, entitled "Cooperative Economic Development Law."
Finding the individual defendants failed to challenge the Bond Resolution and all related matters contained in the Bond Resolution within the time limit allowed by the constitution and statutory law, the court held the rights of any party to challenge the bonds, their documentation, financing, security, and all associated proceedings were perempted. The court found it was subject to a conclusive presumption the bonds, their documentation, financing, security and all associated proceedings complied with all legal requirements. Further, because no timely challenge was asserted, La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L preclude any court from entertaining any challenges to the bonds. For these reasons, the district court found it must grant *673 the motion to strike and enter final judgment validating the bonds.
The judgment further declared the decree forever binding and conclusive as to the validity of the bonds, the validity of the tax, any lease or other means provided for the payment of the bonds, and the validity of all pledges of revenues and of all covenants and provisions contained in the instrument or proceedings authorizing or providing for the issuance of such bonds and as to all matters adjudicated and as to all objections presented or which might have been presented in such proceeding, and shall constitute a permanent injunction against the institution by any person of any action or proceeding contesting the validity of the bonds or any other matters adjudicated or which might have been called in question in such proceedings.
The individual defendants appealed, assigning as error:
(1) The district court erred in hearing and granting a contradictory motion that had not been set for hearing by rule and that had not been served on defendants.
(2) The district court erred in allowing the District to use the "notice by publication" provisions of a statute to avoid actual service on known opposition, to avoid any attempt to provide actual notice to known, easily identifiable interested parties, and to prevent the public from having a fair opportunity to challenge a Cooperative Endeavor Agreement.
(3) The district court erred in using a District bond resolution to perempt any and all challenges to (a) actions by other public bodies that were not yet defined and had not yet taken place at the time the peremptive period had run out; (b) a cooperative endeavor agreement that had not yet been written and did not exist at the time that the peremptive period had run out; and (c) elections that had not taken place at the time the peremptive period had run out.
(4) The district court erred in validating two voter propositions that are clearly unconstitutional on their face.
(5) The district court erred in validating and precluding all challenges to a cooperative endeavor agreement that (a) upon information and belief, will be written in a way that violates La. Const. art. VII, § 14(A); and (b) was never introduced into evidence or even reviewed by the district court.
In a divided opinion, the court of appeal affirmed the district court judgment, reversing only to the extent the district court judgment held a challenge to the legality of the elections was perempted.[12]Denham Springs Economic Development District v. All Taxpayers, Property Owners, and Citizens of the Denham Springs Economic Development District et al., 05-1684 (La.App. 1 Cir. 8/25/05), 927 So.2d 328.
As to the issue of notice and fair hearing, the appellate court found the record contained no evidence that the identity, addresses, or alleged interests of the individual defendants were known to the District, and for lack of specificity of identity and a corresponding recognized substantive liberty or property interest, the court *674 found no violation of due process rights to fair notice and hearing. The appellate court did note, as to the court proceedings, the individual defendants answered the District's motion for judgment within six days and notice of a hearing on the merits of that motion was provided to them.
Regarding the motion to strike, the appellate court found the motion was more akin to a peremptory exception raising the objection of no cause of action or of prescription. Essentially, a hearing on the claim of peremption was held, and the district court ruled the challenge by the defendants was not timely under La.Rev. Stat. 33:9038.4L. Because the peremptory exception may be pleaded at any stage of the proceeding in the trial court prior to submission of the case for a decision, may be disposed of either in advance of or on the trial of the case, and may be noticed by the court on its own motion prior to final judgment, the court found no violation of due process rights. Moreover, no evidence may be admitted on an exception of no cause of action, and the district court ruled the challenge was perempted only after a hearing on the question of timeliness, where both parties argued the point.
The appellate court further found the peremptive period of La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L applied to the unwritten Cooperative Endeavor Agreement because the information provided was sufficient. The court reasoned the published Bond Resolution provided the names of the tax recipient entities that were cooperating in the financing of the Project, the date each one passed a resolution to hold an election to re-dedicate a percentage of the sales tax it collects, and the percentage rate to be dedicated to the project. The Bond Resolution also referenced a future mortgage agreement that would provide more detail and "be more particularly described within the above-referenced Mortgage Agreement, Cooperative Endeavor Agreement and related agreements necessary to effect the purposes. . . ."
The appellate court further noted the statutes do not require a cooperative endeavor agreement to be in final form when referenced in a bond resolution. The court observed "[e]ven under the most stringent statute, which governs cooperative endeavor agreements involving the state, the agreement is required only to `set forth in reasonable detail the obligations of the various parties thereto.'" Denham Springs, 05-1684 at p. 10, 927 So.2d at 335, citing La.Rev.Stat. 33:9029.2A(3). Considering the information provided by the District in the published Bond Resolution, in light of the legislative mandate to afford an expeditious procedure and to invalidate only on the grounds of "substantial" or "material" defects, La.Rev.Stat. 13:5130, the court found the Bond Resolution described a cooperative endeavor agreement and financing plan sufficient to put the taxpayers on notice.
The court further found the district court did not err in holding the peremptive period outlined in La.Rev.Stat. 33:9038.4L applied to the Cooperative Endeavor Agreement described in the Bond Resolution. The appellate court reasoned La. Rev.Stat. 33:9031.1 provides Part XVI of Chapter 32 of Title 13 (Bond Validation Act) is applicable to suits to validate cooperative endeavor agreements and those suits may be filed "as though such agreements constituted the issuance of bonds of a governmental unit."
Finally, the court found it must consider the overall legislative intent to provide an "expeditious" procedure for bond issuance and related matters, in order to insure the stability of the bonds. La.Rev.Stat. 13:5122. The court opined if it were to *675 interpret the peremptive provisions otherwise, a future challenger could impermissibly delay and destabilize the issuance and marketing of governmental bonds, notwithstanding the inclusion of "reasonable detail" in the resolution. La.Rev.Stat. 33:9038.2A(3).
The court of appeal pretermitted discussion of the individual defendants' contention the district court erred in validating a cooperative endeavor agreement that was never introduced into evidence and that they believe will be written in a way that violates the Louisiana Constitution. From this ruling, the individual defendants sought writ from this Court.

LAW AND ANALYSIS
At issue in this case are the provisions of a bond resolution the District adopted setting forth its intention to issue revenue bonds secured by sales tax increment financing collected and pledged through a cooperative endeavor agreement with the relevant participating tax recipient entities. This area of the law tends to be complicated and very technical, so to better understand the specifics of the issues raised in this case, we begin with an overview of the law governing bond resolutions and validation procedures.
Bond Resolutions of Economic Development Districts
To facilitate economic development, a local governmental subdivision or entity may issue revenue bonds payable from revenues generated by economic development projects or from an irrevocable pledge and dedication of sales tax increments to finance or refinance all or any part of an economic development project, provided such tax increment financing is not previously dedicated to another purpose. La.Rev.Stat. 33:9038.4A(1). Any local governmental subdivision, which proposes to issue revenue bonds, shall establish, by ordinance, an economic development district, the governing authority of which shall be the governing authority of the local governmental subdivision establishing the district. La.Rev.Stat. 33:9038.4B & 33:9038.2. The district shall be a political subdivision of the State. La. Rev.Stat. 33:9038.2.
An economic development district may specifically pledge or dedicate "sales tax increments" as a guaranty of any shortfall in the payment of the bonds. La.Rev.Stat. 33:9038.4A(1). Such governmental entities are also allowed to enter into cooperative endeavor agreements with each other and public or private associations or corporations. La.Rev.Stat. 33:9021(6), 33:9029.1, 33:9029.2, 33:9031 & 33:9038.5. "Cooperative endeavors" may include cooperative financing, cooperative development, or any other form of cooperative economic development activity. La.Rev.Stat. 33:9022.1.
Such revenue bonds shall be issued only after the district as issuer has adopted an appropriate resolution giving notice of its intention to issue such revenue bonds, which resolution shall include a general description of the revenue bonds to be issued and the security therefor. La.Rev. Stat. 33:9038.4A(3). Notice of this intention shall be published once a week for two weeks in the official journal of the local government subdivision, the first publication to appear at least fourteen days before the public meeting of the governing authority of the issuer at which the governing authority will meet in open and public session to hear any objections to the proposed issuance of such revenue bonds. La.Rev.Stat. 33:9038.4A(3). The notice of intent so published shall state the date, time, and place of the public hearing. Id.
Additionally, a copy of the resolution authorizing the issuance of bonds shall be published immediately after its adoption in one issue of the official journal of the *676 political subdivision or, if there is none, in a newspaper having general circulation therein. La. Const. art. VI, § 35(B) & La.Rev.Stat. 33:9038.4L. For thirty days after the date of publication, any person in interest may contest the legality of the resolution and any provision therein made for the security and payment of the bonds. La. Const. art. VI, § 35(B) & La.Rev. Stat. 33:9038.4L. Such person may also contest the legality of any provision of the bonds and the validity of all other provisions and proceedings relating to the authorization and issuance of the bonds. La. Rev.Stat. 33:9038.4L. After the expiration of such period, no person shall have any cause of action to test the regularity, formality, legality, or effectiveness of the resolution, and provisions thereof for any cause whatever. La. Const. art. VI, § 35(B) & La.Rev.Stat. 33:9038.4L. Moreover, no person may contest the regularity, formality, legality, or effectiveness of any provisions of the bonds to be issued pursuant thereto, the provisions for the security and payment of the bonds, and the validity of all other provisions and proceedings relating to their authorization and issuance, for any cause whatever. La.Rev.Stat. 33:9038.4L. Thereafter, it shall be conclusively presumed that every legal requirement for the issuance of the bonds or other debt obligation has been complied with. La. Const. art. VI, § 35(B) & La. Rev.Stat. 33:9038.4L. It shall also be conclusively presumed that the bonds, the legal documents providing for the bonds, and all security for the bonds is legal. La.Rev.Stat. 33:9038.4L. No court shall have authority to inquire into any of these matters after the thirty-day publication period. La. Const. art. VI, § 35(B) & La. Rev.Stat. 33:9038.4L.
Validation Procedures
The district may bring at any time a proceeding in the district court having original jurisdiction over the matter, and in which such governmental unit is domiciled, to establish the validity of such bonds and all proceedings taken in connection with the authorization or issuance of such bonds and the validity of the tax, any lease or other means provided for the payment of such bonds, and the validity of all pledges of revenues and of all covenants and provisions, which constitute a part of the contract between such governmental unit and the holders of such bonds. La. Rev.Stat. 13:5123. Such proceeding shall be brought by filing a motion for judgment describing such bonds and the proceeding had relative to the issuance thereof and alleging that such bonds when issued will be valid and legal obligations of the issuing governmental unit. La.Rev.Stat. 13:5123. In such motion for judgment, the taxpayers, property owners, and citizens of the issuing governmental units, including nonresidents owning property or subject to taxation therein, and all other persons interested in or affected in any way by the issuance of such bonds, shall be made parties defendant. La.Rev.Stat. 13:5123.
Any person, corporation, or association desiring to contest or enjoin the issuance of any such bonds shall proceed by motion for judgment brought in the court having jurisdiction under La.Rev.Stat. 13:5123. La.Rev.Stat. 13:5125. Upon the filing of the motion for judgment, the court shall enter an order within five days following the filing, requiring the publication of the motion twice in a newspaper published in or having general circulation in the district within a period of fifteen consecutive calendar days from the date of the issuance of the order, specifying the dates for publication thereof, with the first publication to be not later than eight days from and after the date of the issuance of the order, and at the same time, fix a time and place for hearing the proceeding, which time and place shall be published with the motion *677 for judgment. La. Rev. Stat. 13:5125. The date fixed for hearing shall be at least ten days, but not more than thirteen days, after the second publication of such motion for judgment. La.Rev.Stat. 13:5125.
Any party defendant may answer such motion for judgment within seven days after the second publication thereof, but not thereafter. La.Rev.Stat. 13:5126. Any property owner, taxpayer, citizen, or other person in interest may become a party to the proceedings by pleading to the motion within seven days after the second publication thereof, or thereafter by intervention upon leave of court. La. Rev.Stat. 13:5126.
In the event the decree of the court validates the bonds or validates the action taken to provide a new or different source of payment for the bonds, and no appeal is taken within the time prescribed, or if appeal is taken and the decree of the court is affirmed, such decree shall be forever binding and conclusive as to the validity of the bonds, the validity of the tax, any lease or other means provided for the payment of such bonds and the validity of all pledges of revenues and of all covenants and provisions contained in the instrument or proceedings authorizing or providing for the issuance of such bonds, and as to all matters adjudicated and as to all objections presented or which might have been presented in such proceeding, and shall constitute a permanent injunction against the institution by any person of any action or proceeding contesting the validity of the bonds or any other matter adjudicated or which might have been called in question in such proceedings. La.Rev.Stat. 13:5129. No court in which a proceeding to invalidate or sustain bonds is brought shall invalidate the bonds unless it finds substantial defects, material errors, and omissions in the incidents of such bond issue. La. Rev.Stat. 13:5130. Matters of form shall be disregarded. La.Rev.Stat. 13:5130.
The intent of the Legislature in enacting these laws was to provide a uniform, expeditious, and equitable procedure with due regard for the public fisc and rights of persons in interest for the judicial determination of the validity of bonds and related proceedings where material and substantial questions with regard thereto are involved or a judicial determination of issues relating to bonds is necessary to insure the marketability of bonds in investment channels. La.Rev.Stat. 13:5122. It was not the intention of the Legislature to require or to encourage the validation of all bonds by the judiciary. La.Rev.Stat. 13:5122. Moreover, all suits, actions, and proceedings of whatever nature affecting the validity of bonds of any governmental unit, or the interest thereon, or the sale thereof, or the election, if any, authorizing the issuance of said bonds, shall be brought only in accordance with these provisions, and these provisions shall supersede all other acts and statutes on the subject and be controlling in all such cases, provided, however, nothing contained in these provisions shall affect, change, alter, or modify in any way any peremptive or prescriptive period for the contesting of bonds of governmental units or elections authorizing their issuance, established pursuant to the constitution and statutes of this State, which shall continue to govern the time within which actions covered thereby may be filed. La.Rev.Stat. 13:5122.
Denham Springs Economic Development District's Bond Resolution
In the present case, the District was created in 2003 pursuant to La.Rev.Stat. 33:9038.2 to facilitate economic growth in an area composed of seventy-five acres of vacant property contained within the City of Denham Springs in Livingston Parish. On March 8, 2005, the District adopted a *678 bond resolution concerning the funding structure of the proposed Bass Pro Project, which project is to be funded through the issuance of revenue bonds secured by the pledge of local government sales tax increments in accordance with La.Rev. Stat. 33:9038.1 et seq. The Bond Resolution set forth the District's desire to authorize the issuance of
its Denham Springs Economic Development District Taxable Variable Rate Revenue Bonds (Bass Pro Shops Project) Series 2005A; its Denham Springs Economic Development District Sales Tax Increment Taxable Revenue Bonds (Bass Pro Shops Project) Series 2005B, and its Denham Springs Economic Development District Taxable Subordinate Revenue Bonds (Bass Pro Shops Project) Series 2005C (collectively, the "Bonds") to provide financing for costs related to (I) acquisition of approximately 27 acres of land within the District (the "Bass Pro Site"); (ii) the acquisition, development, construction and equipping of a Bass Pro retail outlet and related infrastructure, (the "Facility") to be operated by Bass Pro Outdoor World, L.L.C. or a related entity ("Bass Pro"); (iii) the construction of related public improvements and infrastructure needed to support the Facility and the remainder of the District (collectively, the "Project"); (iv) funding a deposit to the Debt Service Reserve Fund; (v) paying capitalized interest on the Series 2005A Bonds and the Series 2005B Bonds; and (vi) paying cost of issuance of the Series 2005A and Series 2005B Bonds. . . .
With this general description of the revenue bonds and their purpose, the Bond Resolution set forth the District's desired method of securing payment on the bonds:
the District desires to enter into a Cooperative Endeavor Agreement (the "Cooperative Endeavor Agreement") by and among the District, the City, the Parish, the Gravity Drainage District, the Law Enforcement District, the School Board and the School District, (collectively, the "Participating Tax Recipient Entities," and each a "Participating Tax Recipient Entity"); the Denham Springs Economic Development Corporation (the "Corporation"); and the State of Louisiana, through the Department of Revenue and Taxation (the "State"), to effect the collection and pledge of the sales tax increments to secure the payment of debt service on the Bonds. . . .
The Bond Resolution also stated the participating tax recipient entities had authorized special elections to re-dedicate the proceeds of the sales tax increments collected within the boundaries of the District for the payment of debt service on the bonds issued to finance the Project, specifying the amount of proceeds of sales and use taxes collected by each entity to be pledged to finance the Project:
WHEREAS, pursuant to a resolution dated February 23, 2005, the Livingston Parish School Board (the "School Board") authorized a special election to re-dedicate and use for a limited time an amount equivalent to one hundred percent (100%) of the proceeds of the one percent (1%) sales and use tax collected by the School Board within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 23, 2005, the Livingston Parish School Board authorized a special election to be held in Special Sales Tax District No. 1 of the Parish of Livingston, State of Louisiana (the "School District"), to re-dedicate and use for a limited time an amount equivalent to one hundred percent (100%) of the proceeds *679 of the one-half of one percent (½%) sales and use tax collected by the School District within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 25, 2005, the Law Enforcement District of the Parish of Livingston, State of Louisiana (the "Law Enforcement District"), authorized a special election to re-dedicate and use for a limited time an amount equivalent to seventy-two percent (72%) of the proceeds of the one-half of one percent (½%) sales and use tax collected by the Law Enforcement District within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 28, 2005, the Parish of Livingston, State of Louisiana (the "Parish"), authorized a special election to re-dedicate and use for a limited time an amount equivalent to seventy-two percent (72%) of the proceeds of the one percent (1%) sales and use tax collected by the Parish within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 28, 2005, the City of Denham Springs, State of Louisiana (the "City"), authorized a special election to re-dedicate and use for a limited time an amount equivalent to seventy-two percent (72%) of the proceeds of the one-half of one percent (½%) sales and use tax collected by the City within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 28, 2005, the City authorized a special election to re-dedicate and use for a limited time an amount equivalent to seventy-two percent (72%) of the proceeds of the of [sic] one percent (1%) sales and use tax collected by the City within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; and
WHEREAS, pursuant to a resolution dated February 28, 2005, the Gravity Drainage District No. 1 of the Parish of Livingston, State of Louisiana (the "Gravity Drainage District"), authorized a special election to re-dedicate and use for a limited time an amount equivalent to seventy-two percent (72%) of the proceeds of the one-half of one percent (½%) sales and use tax collected by the Gravity Drainage District within the boundaries of the District for the payment of debt service on the Bonds issued to finance the Project; . . . . .
On March 13, 2005, the Bond Resolution was published in the Livingston Parish News, the official journal of the District published in Denham Springs, Louisiana. The Notice of Intention to Issue Bonds preceding the Bond Resolution in the March 13, 2005 publication set forth the date, time, and place of the public hearing to hear any objections to the issuance of the Bonds: March 28, 2005 at 5:45 p.m. in the City Hall Courtroom, Denham Springs, Louisiana. The record does not show any objections were made at the public hearing. On April 23, 2005, the elections were held to re-dedicate the sales tax increments. On May 26, 2005, the District filed a motion for judgment seeking validation of the bonds and the means of securing and paying them as described in the Bond Resolution. The district court ordered the publication of the motion and the accompanying court order as required by La.Rev.Stat. 13:5124, scheduling *680 the hearing for June 17, 2005. On June 1, 2005, the individual defendants filed their answer. On June 10, 2005, the district court ordered the second publication of the motion with a copy of the order, and another hearing was scheduled for June 28, 2005. The District then filed its motion to strike on June 24, 2005, which was heard on June 28, 2005.
The District contends, to which the lower courts agreed, the thirty-day time limit provided in La. Const art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L for a challenge to the validity of bond resolutions and related proceedings is a peremptive period, commencing with the publication of the Bond Resolution in the official journal of the District on March 13, 2005, that had run before the individual defendants had filed their answer on June 1, 2005. After the expiration of such period, the District contends, it is conclusively presumed that the bonds, the legal documents providing for the bonds, and all security for the bonds is legal and that every legal requirement for the issuance of the bonds has been complied with. Moreover, no court may inquire into any such matters after the thirty-day publication period.
The individual defendants on the other hand contest this contention and the holdings of the lower courts, raising numerous assignments of errors before this Court. We turn now to a discussion of these assignments.
Procedural Due Process
The individual defendants first assert the district court could not hear and decide the motion to strike without proper service and citation because the motion was a contradictory motion the court treated as a dispositive motion, equivalent to a motion for summary judgment. They argue that by hearing the motion that had not been properly set for hearing or served on opposing counsel the court deprived them of the opportunity to present their own evidence in opposition to the motion. We agree with the court of appeal. Essentially, a hearing on the peremptory exception of peremption was held. Because the peremptory exception may be pleaded at any stage of the proceeding in the trial court, may be disposed of either in advance of or on the trial of the case, and may be noticed by the court on its own motion, we find no merit in this assignment of error. La.Code Civ. Proc. arts. 928B, 929B & La. Civ.Code art. 3460. As noted by the court of appeal, the district court ruled the challenge was perempted only after a hearing on the question of timeliness, where both parties argued the point and with the only relevant admissible evidence being the actual publication, the date of which was necessary to the computation of time, specifically the commencement date of the peremptive period.
The individual defendants next assert the District violated the individual defendants' due process right to notice by failing to serve the individual defendants with the Bond Resolution, arguing notice by publication was insufficient for known, easily identifiable interested parties. We find this argument is misplaced.
In Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the United States Supreme Court recognized that prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a state must provide "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 795, 103 S.Ct. 2706, 2709, 77 L.Ed.2d 180 (1983); Mullane, 339 U.S. at 314, 70 S.Ct. at 657. We note the *681 requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of life, liberty, and property. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). When protected interests are implicated, the right to some kind of prior hearing is paramount. Mullane, 339 U.S. at 314, 70 S.Ct. at 657; Roth, 408 U.S. at 569-70, 92 S.Ct. at 2705. The range of interests, however, protected by procedural due process is not infinite, and the Supreme Court has rejected the notion that any grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the Due Process Clause. Ingraham v. Wright, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977); Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); Roth, 408 U.S. at 570, 92 S.Ct. at 2705.
Under current United States Supreme Court case law, every procedural due process case requires application of a two-part test: first, whether a party has been deprived of a protected "life," "liberty," or "property" interest, i.e., whether the party had an interest protected by the constitution; and second, if so, whether the procedures in place comport with due process. American Manufacturers Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 59, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999); Rhonda Wasserman, Procedural Due Process: A Reference Guide to the United States Constitution 31 (Praeger 2004). Only when protected interests are implicated does the right to some kind of notice and hearing attach. Ingraham, 430 U.S. at 672, 97 S.Ct. at 1413; Roth, 408 U.S. at 564-570, 92 S.Ct. at 2705; Wasserman, supra. Moreover, only after finding the deprivation of a protected interest or the implication of a protected interest in life, liberty, or property does the critical question become what process is due, i.e., whether the state's procedures comport with due process. Sullivan, 526 U.S. at 59, 119 S.Ct. at 989; Wasserman, supra.
To determine whether due process requirements apply in the first place, a court must look not to the weight or importance, but to the nature of the interest at stake. Ingraham, 430 U.S. at 672, 97 S.Ct. at 1413; Meachum, 427 U.S. at 224, 96 S.Ct. at 2538; Roth, 408 U.S. at 570, 92 S.Ct. at 2705-06. Thus, in the present case, we must determine if the interest at issue is within the Fourteenth Amendment's protection of liberty or property.
"`Liberty' and `property' are broad and majestic terms. They are among the `(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience. . . . (T)hey relate to the whole domain of social and economic facts, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." Roth, 408 U.S. at 570, 92 S.Ct. at 2706 (citing National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 [1949] (Frankfurter, J., dissenting)). Therefore, the Supreme Court rejected the wooden distinction between "rights" and "privileges" that once seemed to govern the applicability of procedural due process rights. Roth, 408 U.S. at 570, 92 S.Ct. at 2706; Wasserman, supra. The Court also has made clear that the property interests protected by procedural due process extend well beyond actual ownership of money, real estate, or chattels. Roth, 408 U.S. at 572, 92 S.Ct. at 2706; Wasserman, supra. Likewise, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process. Roth, 408 U.S. at 572, 92 *682 S.Ct. at 2706; Wasserman, supra. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words, `liberty' and `property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Roth, 408 U.S. at 572, 92 S.Ct. at 2706.
Under Supreme Court precedent, liberty denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); Ingraham, 430 U.S. at 673, 97 S.Ct. at 1413; Roth, 408 U.S. at 572, 92 S.Ct. at 2706-07; Wasserman, supra. The Fourteenth Amendment's procedural protection of property safeguards the security of interests a person has already acquired in specific benefits. Roth, 408 U.S. at 576, 92 S.Ct. at 2708; Wasserman, supra. These so-called property interests may take many forms. Roth, 408 U.S. at 576, 92 S.Ct. at 2708; Wasserman, supra. For the past thirty years of Supreme Court jurisprudence, the reigning entitlement theory posits property interests are not created by the federal constitution. Wasserman, supra; see also, Roth, 408 U.S. at 577, 92 S.Ct. at 2709. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules and understandings that secure certain benefits and that support claims of entitlement to those benefits. Roth, 408 U.S. at 577, 92 S.Ct. at 2709; Wasserman, supra.
To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.
Roth, 408 U.S. at 577, 92 S.Ct. at 2709.
A court must carefully scrutinize statutory language before finding a property interest created by statute, regulation, or other source of positive law. Wasserman, supra; see generally, American Manufacturers Mutual Insurance Co. v. Sullivan, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Moreover, the Roth-jurisprudence of property implicitly requires a property interest or benefit have some ascertainable monetary value, and a hallmark of a protected property interest is the right to exclude others "one of the most essential sticks in the bundle of rights that are commonly characterized as property. . . ." Town of Castle Rock, Colorado v. Gonzales, 545 U.S. 748, 125 S.Ct. 2796, 2809, 162 L.Ed.2d 658 (2005), citing Merrill, The Landscape of Constitutional Property, 86 Va.L.Rev. 885, 964 (2000); College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd., 527 U.S. 666, 673, 119 S.Ct. 2219, 2224, 144 L.Ed.2d 605 (1999); Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979).
In the present case, the protected interest claimed by the individual defendants appears to be their right to challenge the legality of the Cooperative Endeavor Agreement, the provisions of which are contained within the Bond Resolution. As *683 evident from the specific language of the Bond Resolution, such provisions provide for the security and payment of the bonds. The right to contest the legality of a bond resolution and of any provision therein made for the security and payment of the bonds is guaranteed by La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L. However, and importantly, this right, which is granted to any person in interest, is also temporally limited by the language of both La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L, and must be exercised within thirty days after the date of publication of the bond resolution. The only notification required by the constitutional and statutory language is publication of the resolution in the official journal of the political subdivision.
We note the provisions governing the validation of cooperative endeavor agreements state suits may be filed as though such agreements constituted the issuance of bonds of a governmental unit and that the provisions governing bond validations shall be applicable thereto. La.Rev.Stat. 33:9031.1. As noted previously, the statutes governing bond validations are exclusive and supercede all other acts and statutes, provided nothing shall affect, change, alter, or modify in any way any peremptive period for contesting bonds of governmental units, established by constitution or statute. La.Rev.Stat. 13:5122. The peremptive period for contesting the Bond Resolution in this case is established by constitutional and statutory law, namely, La. Const. art. VI, § 35(B) and La.Rev. Stat. 33:9038.4L, respectively, and therefore, these provisions are controlling.
The individual defendants' right to challenge the provisions of the Bond Resolution made for the security and payment of the bonds does not bear the hallmarks of a constitutionally protected liberty or property interest. It does not constitute a right associated with liberty, nor is the right exclusive to defendants in a property context. The individual defendants do not have the power to prevent others from asserting the challenge; the constitutional and statutory language extend the right to any person in interest. Moreover, the individual defendants have not demonstrated how the right to assert the challenge has an ascertainable monetary value.
We find the District is correct in maintaining the right in this case is a civil law right granted to the public to challenge the actions of a state actor, the District. It is the individual defendants status as members of the public, or rather, citizens of the District, that entitles them to challenge the provisions of the Bond Resolution, specifically the Cooperative Endeavor Agreement, a public action that has only an indirect impact on their interests. In such cases, the United States Supreme Court has found it "may assume that the States have wide latitude to establish procedures not only to limit the number of judicial proceedings that may be entertained but also to determine whether to accord a [member of the public or any interested person] any standing at all." Richards v. Jefferson County, Alabama, 517 U.S. 793, 803, 116 S.Ct. 1761, 1768, 135 L.Ed.2d 76 (1996). In the present case, the State has accorded any person in interest the standing to contest the legality of the bonds, the bond resolution, and the provisions made for the security and payment of the bonds, but the State has temporally limited the exercise of the right to a thirty-day peremptive period. La. Const. art. VI, § 35(B) & La.Rev.Stat. 33:9038.4L.[13]
*684 Because no constitutionally protected property interest is involved in this case, the State is free to limit and restrict the right to assert any challenge without violating due process requirements. See Richards, 517 U.S. at 803, 116 S.Ct. at 1768. The notification procedure set forth in our constitution and statutory law was appropriately followed by the publication of the Bonds Resolution in the Livingston Parish News.[14]
Peremption
The individual defendants next assert a bond resolution cannot perempt any and all challenges to a cooperative endeavor *685 agreement that had not even been written at the time of the adoption and subsequent publication of the resolution, nor all claims regarding actions by other public bodies, when those actions had not yet taken place and when the terms and conditions of those actions had not yet been defined. While we find this contention has some appeal, we note a careful reading of both La. Const. art. VI, § 35(B) and La.Rev. Stat. 33:9038.4L does not support this argument.
Peremption is a period of time fixed by law for the existence of a right. La. Civ. Code art. 3458. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period. La. Civ. Code art. 3458. Furthermore, although the provisions on prescription governing computation of time apply to peremption, it is well established that unlike prescription, peremption may not be renounced, interrupted, or suspended. La. Civ.Code arts. 3459 & 3461.
In recognition of the unique nature of municipal bonds and the importance of insuring their marketability, Louisiana constitutional and statutory provisions provide an exclusive method to expedite all proceedings involving the validity of bonds and the security therefor. La.Rev.Stat. 13:5122. The law peculiar to challenges to municipal bonds and their validation include stringent constitutional and statutory restrictions concerning the time period within which a challenge can be asserted.
La. Const. art. VI, § 35(B) provides, in pertinent part:
For thirty days after the date of publication [of the bond resolution], any person in interest may contest the legality of the . . . resolution and of any provision therein made for the security and payment of the bonds. After that time, no one shall have any cause of action to test the regularity, formality, legality, or effectiveness of the . . . resolution, and provisions thereof for any cause whatever. Thereafter, it shall be conclusively presumed that every legal requirement for the issuance of the bonds or other debt obligation, including all things pertaining to the election, if any, at which the bonds or other debt obligation were authorized, has been complied with. No court shall have authority to inquire into any of these matters after the thirty days.
Accordingly, La. Const. art. VI, § 35(B) provides any challenge to the legality of the resolution and any provision made for the security and payment of the bonds must be asserted within thirty days of the publication of the resolution. After the thirty days, any right to test the regularity, formality, legality, or the effectiveness of the resolution, including any of its provisions, is extinguished, and it is conclusively presumed every legal requirement for the issuance of the bonds has been satisfied. Further, no court has authority to inquire into these matters after the thirty days.
In situations in which the bonds at issue are part of a tax increment financing plan, additional statutory provisions restrict challenges to the bond resolution. La. Rev.Stat.33:9038.4L, governing sales tax increment financing, provides, in pertinent part:
For thirty days after the date of publication [of the bond resolution], any person in interest may contest the legality of such . . . resolution, any provision of the bonds, the provisions therein made for the security and payment of the bonds, and validity of all other provisions and proceedings relating to the authorization and issuance of the bonds. After the expiration of such period, no person may contest the regularity, formality, legality or effectiveness of the resolution, any *686 provisions of the bonds to be issued pursuant thereto, the provisions for the security and payment of the bonds, and the validity of all other provisions and proceedings relating to their authorization and issuance, for any cause whatever. Thereafter, it shall be conclusively presumed that the bonds, the legal documents providing for the bonds, and all security for the bonds is legal and that every legal requirement for the issuance of the bonds has been complied with. No court shall have authority to inquire into any of these matters after the aforementioned publication period.
Thus, as to revenue bonds issued under a tax increment financing plan, La.Rev. Stat. 33:9038.4L provides any challenge to the legality of a bond resolution authorizing the issuance of bonds, any provision of the bonds, the provisions made for the security and payment of the bonds, and validity of all other provisions and proceedings relating to the authorization and issuance of the bonds must be asserted within thirty days of the publication of the resolution. After the thirty-day period, any right to contest the regularity, formality, legality, or effectiveness of the resolution, any provision of the bonds, the provisions for the security and payment of the bonds, and the validity of all other provisions relating to their authorization and issuance for any cause whatsoever is extinguished, and it is conclusively presumed that the bonds, the legal documents providing for the bonds, and all security for the bonds are legal and every legal requirement for the issuance of the bonds has been satisfied. Further, no court has authority to inquire into these matters after the thirty days.
The provisions of La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L provide a thirty-day period for the exercise of the right to contest the legality of a bond resolution and its security provisions, a right that extinguishes upon the expiration of the thirty-day publication period. Thus, both the constitutional and statutory provisions clearly and unambiguously create a thirty-day peremptive period for contesting the legality of a bond resolution and any provisions made therein for the security and payment of the bonds. This peremptive period commences with the publication of the bond resolution in the official journal of the political subdivision. It is during this period that any person of interest may present to the court any questions or concerns the person may have regarding the bonds, the security for the bonds, and any provision of the bond resolution. After the expiration of the thirty-day period, the right to contest is extinguished or perempted, and it is conclusively presumed all legal requirements for the issuance of the bonds have been satisfied and that the bonds, the legal documents providing for the bonds, and all security for the bonds are legal. Moreover, no court has authority to consider any challenge after the thirty-day peremptive period.
We will now apply this body of law on peremption to the specifies of this case. Because the bonds for which the Bond Resolution pertained were issued by a local political subdivision and constitute revenue bonds under a sales tax increment financing plan, both La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L are applicable with their respective peremptive periods. It is uncontested the Bond Resolution at issue was published on March 13, 2005, in the Livingston Parish News, the official journal of the District published in Denham Springs, Louisiana. According to the constitutional and statutory language addressed above, any person of interest had thirty days from the publication to contest the legality of the resolution and any provisions made for the security and payment of the bonds. It was during this *687 period that the individual defendants as interested persons could and should have presented to the court any questions or concerns they may have had regarding the provisions of the Bond Resolution for the security and payment of the bonds, specifically the Cooperative Endeavor Agreement provisions. After the thirty-day publication period, the right to contest the Bond Resolution and the security provisions was extinguished, and a conclusive legal presumption of the validity of the bonds and the security provisions was established. After that time, the courts have no authority to consider any challenges as to these matters.
The individual defendants argue the thirty-day peremptive period could not commence with the publication of the Bond Resolution in that the provisions of the Cooperative Endeavor Agreement had not yet been written and, therefore, not noticed to the public in the publication. We are not persuaded by this argument. There was sufficient information in the Bond Resolution to notify the public of the relevant provisions of the Cooperative Endeavor Agreement the District sought to enter into to secure the payment of the bonds.
The Bond Resolution provided the names of the participating tax recipient entities that were cooperating in the financing of the bonds and the Project, the date each entity passed a resolution to hold an election to re-dedicate a percentage of the sales tax it collected, and the percentage rate to be dedicated to the payment and security of the bonds and the Project. The Bond Resolution set forth the obligation each participating tax recipient entity would assume by entering into the Cooperative Endeavor Agreement, i.e., the collection and pledge of the specific percentage of sales tax re-dedicated by the public to the financing of the Project.[15] The cooperation of the participating tax recipient entities was evident in the provisions outlining the resolutions each entity passed to hold an election to re-dedicate a percentage of the sales tax the entity collected to finance the Project. Furthermore, the questions the individual defendants raise in their application and briefs to this Court that they argue were left unanswered in the Bond Resolution regarding the Cooperative Endeavor Agreement, are questions the individual defendants could have raised during the thirty-day peremptive period. Those questions arise from the individual defendants' review and study of the Bond Resolution, which they had notice of since March 13, 2005, when the Bond Resolution was published in the local newspaper.
Moreover, the Bond Resolution stated "the District desires to enter into a Cooperative Endeavor Agreement . . . to effect the collection and pledge of the sales tax increments to secure the payment of debt service on the Bonds. . . ." (Emphasis added). A careful reading of the Bond Resolution clearly demonstrates the District sought to enter into the Cooperative Endeavor Agreement to secure payment on the bonds. Thus, the Cooperative Endeavor Agreement provisions contained in the Bond Resolution were provisions made therein for the security and payment of the bonds. To challenge such provisions, an interested person must have asserted his challenge within thirty days from the publication of the Bond Resolution, or the right to contest the provisions would be *688 perempted. The individual defendants failed to challenge the provisions within the thirty-day peremptive period, and therefore, the right to challenge the provisions made for the security and payment of the bonds, specifically the Cooperative Endeavor Agreement, is perempted. Peremption is upheld even when it results in harsh consequences.
Significantly, we note Section 11 of the published Bond Resolution recited the provisions of La.Rev.Stat. 33:9038.4L, which notified the public and all interested persons of the specific thirty-day peremptive period. Given the high profile nature and the litigious history of this case, we find their arguments most unconvincing when all this information, to include the time limitation to bring an objection, is published in the local newspaper.
In conclusion, we find no procedural due process was required beyond that established by the constitution and statute to notify the public of the Bond Resolution by publication in the official journal of the District as no constitutionally protected property or liberty interest exists to contest the legality of the Bond Resolution and its provisions. Further, we find La. Const. art. VI, § 35(B) and La.Rev.Stat. 33:9038.4L prescribed a peremptive period in which to exercise the right to contest the legality of bond resolutions and their security provisions. Because the individual defendants failed to timely exercise the right to contest the Bond Resolution and its security provisions, their challenge is now perempted.

DECREE
For the foregoing reasons, we affirm the judgment of the court of appeal.
AFFIRMED.
NOTES
[1] Tax increment financing (TIF) is a tool used to finance public investments and infrastructure improvements needed for economic development in specific geographical areas, usually blighted or economically depressed areas, or rather, to finance the redevelopment of economically depressed or blighted areas, without causing any additional tax burden on local taxpayers. Joyce Y. Man, "Introduction," Tax Increment Financing and Economic Development: Uses, Structures, and Impacts, ch. 1, 1 (Craig L. Johnson & Joyce Y. Man, ed., State University of New York Press 2001); Alan C. Weinstein & Maxine Goodman Levin, "Tax Increment Financing," 6 Zoning and Land Use Controls, ch. 33B, 33B-3 (Eric Damian Kelly, ed., Matthew Bender & Co.2006). The use of TIF establishes a geographic area for which debt instruments, such as bonds, are issued and in some cases a TIF district may opt to spend revenue as it is collected to finance specific public improvements that will presumably enable economic development or redevelopment, usually by installing physical infrastructure that makes a particular project possible. J. Drew Klacik & Samuel Nunn, "A Primer on Tax Increment Financing," Tax Increment Financing and Economic Development: Uses, Structures, and Impacts, ch. 2, 15 (Craig L. Johnson & Joyce Y. Man, ed., State University of New York Press, 2001). In Louisiana, TIF is authorized by the State's Cooperative Economic Development Law, La. R.S. 33:9020, et seq.
[2] For clarification, we refer to these two defendants as "the individual defendants" as they are not specifically enumerated in the caption and of the defendants, these two individuals alone answered the District's suit, appealed the district court's judgment, and sought writ from this Court.
[3] This case was previously before this Court in Denham Springs Economic Development District v. All Taxpayers, Property Owners, and Citizens of the Denham Springs Economic Development District et al., 04-1674 (La.2/4/05), 894 So.2d 325. [Denham Springs I]. Finding the taxing authorities could not unilaterally, without the acquiescence of the voters, use otherwise dedicated public funds to finance the Bass Pro Shops Project, we pretermitted discussion of whether the TIF statute, La. R.S. 33:9020, et seq., violates the constitution. Denham Springs I, 04-1674 at p. 15, 894 So.2d at 335.
[4] The bonds are described as the District's Denham Springs Economic Development District Taxable Variable Rate Revenue Bonds (Bass Pro Shops Project) Series 2005A; its Denham Springs Economic Development District Sales Tax Increment Taxable Revenue Bonds (Bass Pro Shops Project) Series 2005B, and its Denham Springs Economic Development District Taxable Subordinate Revenue Bonds (Bass Pro Shops Project) Series 2005C.
[5] Collectively, these entities are the "Participating Tax Recipient Entities" and each a "Participating Tax Recipient Entity."
[6] Local governmental subdivisions are authorized to create and organize nonprofit economic development corporations pursuant to La.Rev.Stat. 33:9023.
[7] La.Rev.Stat. 33:9038.4A(6) provides:

Subject to dedication by law and the provisions of R.S. 33:9029.2, state of Louisiana sales tax increments may be dedicated to pay the revenue bonds of a local economic development project but shall not exceed the aggregate portion of the local sales tax increment dedicated for such purposes. Prior to the dedication of any sales tax increments to pay revenue bonds for a local economic development project, the secretary of the Department of Economic Development shall submit the proposed project to the Joint Legislative Committee on the Budget for approval. In addition, any cooperative endeavor agreement or other agreement providing for the expenditure of funds collected by the state as state sales tax increments and dedicated to a project or for the payment of revenue bonds therefor shall be subject to approval by the State Bond Commission prior to execution by the State.
[8] For the specific provisions of the Bond Resolution regarding the elections, see infra section entitled Denham Springs Economic Development District's Bond Resolution.
[9] The issuance of the Bass Pro Shops revenue bonds has been approved by the State Bond Commission.
[10] Prior to this action, on or about February 14, 2005, counsel for the individual defendants contacted counsel for the District by certified letter asking that, in addition to any notice by publication requirement imposed by statute, the District provide actual notice of any legal actions that might affect the individual defendants' right to challenge the proposed Project. A copy of the letter is filed in the record and provides, in pertinent part:

I understand from the various newspaper accounts that the Denham Springs Economic Development District, et al., are considering alternative mechanisms for proceeding with the Bass Pro Project in Denham Springs, Louisiana. In addition to the notice by publication required by the Bond Validation Statute and/or any other applicable statute, I would appreciate it if you would provide my office with actual notice of any legal proceeding filed by you or by any party involving this proposed project. By copy of this letter to all other parties, I am requesting that any party instituting such a legal proceeding or made aware of such a legal proceeding provide actual notification to my office as well.
[11] The District filed a blank, undated, and unsigned rule to show cause with the motion and faxed a copy of its filings to counsel for the individual defendants later that day. The individual defendants assert that at no time did counsel receive a date for the hearing of the rule or a signed rule or service and citation as required by the Code of Civil Procedure. Our review of the record revealed nothing to contradict this assertion.
[12] The court of appeal found, reading La. Const. art. VI, § 35(A) and (B) in pari materia, a challenge to the legality of the relevant tax election held after the thirty-day peremptive period had run was not foreclosed. Therefore, to the extent the district court held a challenge to the legality of the elections was perempted, the appellate court reversed. The District did not seek a writ from this Court on that ruling, but attempted to brief that issue. However, if an opponent seeks modification of the judgment, it must apply for a writ. Because the District did not seek a writ on this issue, this Court pretermits consideration of the District's argument on this aspect of the appellate judgment.
[13] We are not persuaded by the individual defendants' argument that they were entitled to personal notice merely by the request made by their counsel in the certified letter of February 14, 2005, to the District, in which counsel asked that, in addition to any notice by publication requirement imposed by statute, the District provide actual notice of any legal actions that might affect the right to challenge the proposed Project. See supra, note 10. In brief, they argue the publication constituted a legal proceeding. We are not going to engage in a discussion of whether notice by publication of a bond resolution is a legal proceeding. We view counsel's request for notice as a request for a courtesy copy of the formal motion for judgment or other legal filing. In support, we note counsel for the individual defendants requested this notice in light of World Trade Center Taxing Dist. v. All Taxpayers, 04-1365 (La.App. 4 Cir. 09/01/04), 883 So.2d 459, involving the issue of whether the statutory notice by publication requirement of a motion for judgment violated the procedural due process requirements of the federal constitution. The individual defendants did receive notice of the motion for judgment in this case, and moreover, the issue in World Trade Center is not present in this case. In light of the Supreme Court jurisprudence discussed above, we view the individual defendants' argument on this point as a request to this Court to find a right to notification created by mere request to opposing counsel by certified letter. However, a property interest protected by the Fourteenth Amendment's procedural due process requirement, from which stems the right to notice, is created by state law, not by request of the parties.
[14] Because no protected interest in life, liberty, or property was implicated or deprived, we need not determine whether the notification procedures comport with due process or what process is due. Sullivan, 526 U.S. at 59, 119 S.Ct. at 989. We do note, however, that a majority of the case law relied upon by the individual defendants in their application and briefs governs the form and extent of notice due. This case law deals with the second prong of the current due process analysis, which a court only engages in following the finding of a protected property or liberty interest and which addresses the issue of whether the procedures in place comport with due process. Id. Under the circumstances of this case, we find the reliance on these cases is misplaced.

The landmark case of Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), addressed the form and extent of notice required by due process in the absence of personal service of process and considered the constitutionality of notice provided to beneficiaries of a common trust fund set up pursuant to legislation that permitted the pooling of several participating trusts into a single common trust for investment administration. In Walker v. City of Hutchinson, Kansas, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956), the Supreme Court held notice by publication was inadequate to protect the rights of property owners whose land was condemned by the city. Further, in Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), the Court considered a challenge to a statute that permitted New York City to condemn land required for its water system and that required notice by publication and posting of handbills in the vicinity of the real estate taken. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) involved the form and extent of due process and the rules of procedure in proceedings brought under the Civil Rights Act of 1957. Dusenbery v. United States, 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) addressed the adequacy of procedure used by the Federal Bureau of Investigation to provide notice of administrative forfeiture of cash seized during the search of a residence where the claimant had been arrested. All of these cases relied upon by the individual defendants involve a determination of the adequacy of procedures used in depriving individuals of protected property or liberty interests, which we have determined do not exist in this case.
[15] See supra section entitled Denham Springs Economic Development District's Bond Resolution, reproducing the relevant Cooperative Endeavor Agreement provisions and the provisions specifying the amount of proceeds of sales and use taxes collected by each entity to be pledged (re-dedicated) to finance the Project.